UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

DALE MISKEY, Individually and on Behalf of
All Others Similarly Situated,

                         Plaintiff,

     vs.

NEW YORK COMMUNITY BANCORP,
INC., THOMAS ROBERT CANGEMI and
JOHN J. PINTO,

                        Defendants.

———————————————————— x

Civil Action No. _____

<u>CLASS ACTION</u>

**COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS**

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Dale Miskey ("plaintiff"), on behalf of himself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation by and through plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by New York Community Bancorp, Inc. ("NYCB" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of NYCB securities between March 1, 2023 and February 5, 2024, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against NYCB and certain of the Company's senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      NYCB, based in Hicksville, NY, is one of the largest regional banks in the nation. NYCB was founded in 1859 and became a public company in 1993.  Since that time, the Company has grown organically and through a series of mergers and acquisitions.  For most of its history, NYCB focused primarily on conservative and traditional types of lending products and banking relationships, such as residential mortgages.

3.      During 2022, NYCB embarked on a plan to transform its business by expanding into commercial loan products.  NYCB rapidly expanded its operations and assets in an extremely short period first through its acquisition of Flagstar Bancorp, Inc. ("Flagstar") in late 2022 and then

through its acquisition of a substantial amount of the assets of Signature Bridge Bank, N.A. ("Signature Bank") in early 2023.  NYCB nearly doubled its total assets from $63 billion to $123.8 billion over the short span of approximately four months as a result of these two transactions.

4.      Unbeknownst to investors, throughout the Class Period, Defendants made materially false and misleading statements about NYCB's business, financial condition and the impact of the Flagstar and Signature Bank acquisitions.  For example, on March 1, 2023, the first day of the Class Period, NYCB issued its fiscal year 2022 ("FY22") Annual Financial Report falsely claiming, as it would throughout the Class Period, that it had "strong" asset quality in its commercial lending facility and that "[b]ased upon all relevant and available information…management believes that the allowance for losses on loans was appropriate…"  When discussing the Signature Bank acquisition, Defendants misrepresented that it would be immediately accretive to the Company and failed to warn investors of the detrimental impact the acquisition would have on its balance sheet and financial condition.

5.      Importantly, NYCB's growth in total assets to over $100 billion subjected NYCB to, among other things, stricter risk-based and leverage capital requirements and liquidity standards. Defendants failed to disclose that NYCB was required – but failed – to build up capital, reinforce its balance sheet, and strengthen its risk management processes.  And Defendants falsely assured investors that the Company had adequate internal risk and disclosure controls in place for NYCB's business and rapid growth.

6.      Defendants' materially false and misleading statements caused an artificial inflation in the price of NYCB common stock – reaching a Class Period high of more than $14 a share on July 28, 2023.

7.      On January 31, 2024, in connection with reporting its fourth quarter and fiscal year 2023 ("4Q23" and "FY23") financial results, NYCB disclosed that it had recorded a $552 million provision for loan losses, up significantly from the $62 million reported just one quarter earlier, and that as a result, the Company had incurred a 4Q23 loss of $252 million, or $0.36 per share, far below the ***profit*** of $0.27 per share expected by analysts based on the Company's statements.

8.      The Company also disclosed that NYCB had belatedly adjusted to its new capital and regulatory requirements as a result of the Signature Bank acquisition, stating that the Company's total assets had surpassed $100 billion, thereby "subjecting [it] to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards" and more, and that as a result, it had "[taken] decisive actions to build capital, reinforce [its] balance sheet, strengthen [its] risk management processes, and better align [itself] with the relevant bank peers."  NYCB also revealed it would slash the Company's historically stable quarterly dividend from $0.17 per share to just $0.05 per share.

9.      On this news, the market price of NYCB common stock declined precipitously, falling approximately $4 per share, or 39%, to close at $6.47 per share on January 31, 2024, on unusually high trading volume of more than 128.6 million shares traded, or 17 times its average trading volume over the preceding ten trading days.

10.     After the close of trading on January 31, 2024, Moody's Investors Service announced that it had placed all of NYCB's corporate debt ratings, including the bank's long-term issuer rating of Baa3 — the lowest investment-grade level — on review for possible downgrade to junk status, citing the Company's surprising 4Q23 loss and slashing of its dividend.  On this news, the market price of NYCB common stock closed down another $0.82 per share on nearly 126 million shares traded on February 1, 2024.

- 3 -

11.     Then, on February 5, 2024, after the close of trading, *Bloomberg* reported, citing "people with direct knowledge of the matter," that it had been "mounting pressure from a top US watchdog" that had "led to [NYCB's] surprise decision to slash its dividend and stockpile cash in case commercial real estate loans [went] bad."  According to *Bloomberg*, "[t]he drastic financial moves…followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency [the "OCC"] …"  *Bloomberg* also revealed that NYCB's chief risk officer and chief audit executive left the Company in the fourth quarter of 2023.

12.     On this news, the market price of NYCB common stock again declined precipitously, falling another $1.20 per share, or 22%, to close at $4.20 per share on February 6, 2024, its lowest level since 1997, on unusually high trading volume of more than 147 million shares traded.

13.     Finally, on February 6, 2022, after the close of trading, Moody's Investor Service slashed the Company's corporate debt rating to junk status.  NYCB also announced that it had further shaken up its executive leadership, naming Alessandro DiNello, the former head of Flagstar, as executive chairman.  As reported by the *Wall Street Journal*, "[Dinello] said he was coming in to right the ship."

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5].  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

15.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b) because certain of the acts and practices complained of herein occurred in this District and the statements that form the subject of this complaint were disseminated into this District.  NYCB is

headquartered in this District and each of the Individual Defendants (listed below) resides in and/or maintains their place of business in this District.

16.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff Dale Miskey, as set forth in the accompanying certification incorporated herein by reference, purchased NYCB common stock and has been damaged thereby.

18.     Defendant NYCB is the bank holding company for Flagstar Bank, one of the largest regional banks in the United States.  The Company is headquartered in Hicksville, New York, and operates approximately 420 branches around the nation, including numerous branches in the Northeast and Midwest.  NYCB common stock was listed and traded on the New York Stock Exchange ("NYSE"), an efficient market, throughout the Class Period under the ticker symbol NYCB.  As of November 3, 2023, there were more than 722 million shares of NYCB common stock issued and outstanding.  NYCB also lists its preferred shares on the NYSE under the ticker symbols NYCB-PU and NYCB-PA.

19.     Defendant Thomas R. Cangemi ("Cangemi") has served as the President, Chief Executive Officer ("CEO"), and a member of NYCB's Board of Directors since December 31, 2020, and as Chairman of NYCB since March 26, 2021.  Prior to his appointment as CEO, Cangemi served as the Company's Senior Executive Vice President and Chief Financial Officer ("CFO") since April 5, 2005.

20.     Defendant John J. Pinto ("Pinto") has served as the CFO of NYCB since December 31, 2020, and as Senior Executive Vice President since February 5, 2021.  Prior to this,

Pinto served as Executive Vice President and Chief Accounting Officer of the Company since April 5, 2005.

21.     Defendants Cangemi and Pinto are referred to together herein as the "Individual Defendants."  NYCB and the Individual Defendants are referred to collectively herein, as the "defendants."

22.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, and financial condition.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein; were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws.

23.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's business, operations, and financial condition.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC

filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

25.     New York Community Bancorp was founded on April 14, 1859, in Flushing, Queens, as the Queens County Savings Bank, and changed its name on December 15, 2000, to New York Community Bancorp to better reflect the expansion of its market area beyond Queens.

26.     The Company became a public company in 1993 through an initial public offering and grew organically and through a series of mergers and acquisitions. In December 2009, NYCB expanded its branch footprint outside of the New York metropolitan area for the first time through its acquisition of AmTrust, a bank headquartered in Cleveland, Ohio, with 66 branches and $13 billion in assets in Ohio, Florida and Arizona. NYCB acquired AmTrust after its seizure by the FDIC. By 2015, NYCB was the largest lender in the New York City metro area.

27.     NYCB had traditionally been known for its avoidance of risky products and focus on income-producing assets in an effort to provide steady cash flows, even in adverse credit cycles, according to a November 1, 2015 article in The Real Deal titled "Ranking New York's biggest real estate lenders." A large amount of the loans NYCB originated were multi-family or commercial loans in New York City involving buildings at full rental capacity and subject to New York rent control laws. *Id.*

28.     For most of the Company's history, contrary to the aggressive lending strategies pursued by its larger national rivals, NYCB traditionally focused on safer and more traditional types of loans as opposed to riskier loans, such as commercial real estate construction loans.  For example, NYCB originated approximately $7.8 billion in loans with a $9.9 million average loan value, consisting of mostly conventional multi-family and commercial loans, during 2021.

29.     During 2022, NYCB embarked on a plan to transform the Company from its traditional business lines into a commercial banking model.  A key part of that effort was through NYCB's acquisition of Flagstar Bancorp, Inc. ("Flagstar" or "Flagstar Bancorp") on December 1, 2022, representing NYCB's largest acquisition to date.  Flagstar was a large regional bank based in the Midwest.  As described by Defendant Cangemi in NYCB's January 31, 2023 press release announcing fourth quarter and full year 2022 financial results (the "1/31/23 Press Release"), "[the Flagstar] acquisition closed on December 1st and we are already seeing some of the benefits we outlined when the transaction was first announced. The transformation of the Company to a commercial banking model is underway, as we have started to diversify both our loan portfolio and our funding mix."

30.     In connection with the Flagstar acquisition: (i) Flagstar Bank, FSB converted to a national bank to be known as "Flagstar Bank, N.A."; and (ii) New York Community Bancorp was merged with and into Flagstar Bank N.A., with Flagstar Bank N.A. continuing as the surviving entity.  NYCB's assets substantially increased as a result of the Flagstar acquisition.  As reported by the Company in its 1/31/23 Press Release, NYCB's total assets were $90.1 billion, compared to $63 billion at the previous quarter before the acquisition.

31.     Shortly thereafter, on March 19, 2023, NYCB acquired an additional $38.4 billion in assets from Signature Bank, including approximately $13 billion in loans and 40 branches.  The

purchased loans consisted exclusively of commercial and industrial loans ("C&I").  In a March 20, 2023 press release announcing the acquisition of Signature Bank assets, NYCB highlighted that the transaction "SIGNIFICANTLY ACCELERATES NEW FLAGSTAR BANK'S TRANSFORMATION TO A HIGH-PERFORMING COMMERCIAL BANK."

32.     NYCB's total assets exceeded $100 billion as a result of the Signature Bank acquisition and was required to meet the standards of a Category IV bank.

33.     Just prior to the acquisition, Signature Bank had been placed in receivership as a result of a "run on the bank" where Signature customers withdrew more than $10 billion in deposits. As currency for the Signature acquisition, NYCB provided approximately 39 million shares of the Company to the Federal Deposit Insurance Corporation ("FDIC"), which was serving as receiver for Signature Bank after its closure.

34.     At the time of its closure by state banking officials, Signature was rated as the fourth largest U.S. bank by uninsured banking deposits, with 89.3% of deposits being uninsured.  Internal reviews by the FDIC and New York state regulators noted that Signature's risk controls and corporate governance had not grown commensurate with an increase in deposits in the late 2010s and early 2020s.

35.     On May 16, 2023, NYCB issued a press release announcing the pricing of a secondary offering of its common stock by the FDIC, as receiver for Signature Bank (the "Offering").  The shares in the secondary offering were offered and sold pursuant to an automatic shelf registration statement (including a prospectus) filed by the Company with the SEC which became effective upon filing on or about May 16, 2023.  The FDIC obtained more than $393 million through the sale of the shares to the public and no longer held any shares of the Company after the sale.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING
### STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

36.     The Class Period starts on March 1, 2023.  On that date, NYCB filed its fiscal year 2022 Annual Financial Report with the SEC on Form 10-K (the "FY22 10-K").  The FY22 10-K claimed, as NYCB would throughout the Class Period, that NYCB's asset quality in its commercial lending facility was "strong."  The FY22 10-K stated, in pertinent part, as follows:

**Asset Quality**

***Asset quality remained strong during 2022 as increases in NPAs [non performing assets] were substantially due to changes in asset mix related to the Flagstar acquisition*** and centered on non-performing one-to-four family residential and home equity loans.  Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by NPLs and assets acquired in the Flagstar acquisition.[1]

At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.

\*        \*        \*

***At December 31, 2022, total assets were $90.1 billion***, up $30.6 billion or 51 percent compared to December 31, 2021.  ***The growth compared [to] the prior period was primarily due to the Flagstar acquisition which added $25.8 billion of assets***, net of PAA, while the remaining growth was driven by growth in our lending portfolios.

37.     While purporting to warn that the Company's "allowance for credit losses ***might*** not be sufficient to cover our actual losses," the FY22 10-K falsely assured investors that based on what defendants then knew, "management [then] believe[d] that the allowance for losses on loans was appropriate," stating, in pertinent part, as follows:

<u>**Provision for Credit Losses**</u>

For the twelve months ended December 31, 2022, the provision for credit losses totaled $133 million compared to $3 million for the twelve months ended December 31, 2021.  ***The fourth-quarter and full-year provision for credit losses***

---

[1] Emphasis is added to block quotes herein unless otherwise indicated.

*was impacted by the provision for credit losses related to the initial ACL measurement of non-PCD Flagstar acquired loans totaling $117 million.*

\*        \*        \*

*Our allowance for credit losses might not be sufficient to cover our actual losses, which would adversely impact our financial condition and results of operations*.

In addition to mitigating credit risk through our underwriting processes, we attempt to mitigate such risk through the establishment of an allowance for credit losses.  The process of determining whether or not the allowance is sufficient to cover potential credit losses is based on the current expected credit loss model or CECL.  This methodology is described in detail under "Critical Accounting Estimates" in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report. *CECL may result in greater volatility in the level of the ACL, depending on various assumptions and factors used in this model. If the judgments and assumptions we make with regard to the allowance are incorrect, our allowance for losses on such loans might not be sufficient, and an additional provision for credit losses might need to be made.* Depending on the amount of such loan loss provisions, the adverse impact on our earnings could be material. In addition, growth in our loan portfolio may require us to increase the allowance for credit losses on such loans by making additional provisions, which would reduce our net income. Furthermore, bank regulators have the authority to require us to make provisions for credit losses or otherwise recognize loan charge-offs following their periodic review of our loan portfolio, our underwriting procedures, and our allowance for losses on such loans. Any increase in the loan loss allowance or in loan charge-offs as required by such regulatory authorities could have a material adverse effect on our financial condition and results of operations.

\*        \*        \*

*Partially reflecting the net recoveries noted above, and the provision of $133 million for the allowance for loan losses, the allowance for credit losses increased $194 million, equaling $393 million at December 31, 2022* from $199 million at December 31, 2021. *The majority of the increase is related to the initial provision for credit losses of $117 million and the adjustment for PCD loans acquired in the Flagstar acquisition*. The allowance for credit losses on loans and leases represented 278.87 percent of non-performing loans at December 31, 2022, as compared to 611.79 percent at the prior year-end.

*Based upon all relevant and available information at the end of this December, management believes that the allowance for losses on loans was appropriate at that date*.

(First emphasis in original.)

38.     On March 20, 2023, NYCB filed a Form 8-K with the SEC which attached a press release announcing the acquisition of Signature Bank assets (the "3/20/23 Form 8-K").  The 3/20/23 Form 8-K stated that NYCB subsidiary Flagstar had "acquired certain assets and assumed certain liabilities of [Signature Bank] from the [FDIC]" effective March 19, 2023.  According to the 3/20/23 Form 8-K, the FDIC would receive NYCB stock as consideration at a rate to be determined based on the price appreciation on NYCB stock on or before March 31, 2023.  The transaction was announced as a completed deal – not requiring shareholder approval – and the 3/20/23 Press Release emphasized that it was then "***EXPECTED TO BE SIGNIFICANTLY ACCRETIVE TO BOTH EARNINGS PER SHARE AND TANGIBLE BOOK VALUE***."

39.     The 3/20/23 Press Release also stated, in pertinent part, that "[f]inancially, the deal is expected to be significantly accretive to both earnings per share and to tangible book value per share" and that NYCB's "asset quality metrics remain solid, as they have over multiple business cycles."

40.     A slide presented during the investor telephone conference (filed with the SEC as an updated presentation on March 23, 2023) claimed that the transaction "***Significantly Strengthens*** NYCB's Deposit Base and Funding Profile" citing, among other things, that "Deposits increase from $59Bn to $93Bn; significant amount of noninterest bearing deposits."  Another slide laid out a specific "Integration Plan" and describing it as a "***seamless transition***."

41.     On this news, the market price of NYCB common stock traded higher and closed on March 20, 2023, at $8.61 per share, an increase of $2.07 per share, or 31.65%, compared with the $6.54 per share closing price of NYCB common stock on March 17, 2023.

42.     On March 31, 2023, NYCB filed a Current Report with the SEC on Form 8-K stating that "in connection with the exercise of the [agreement with] the FDIC Receiver, the Company

issued to the FDIC Receiver 39,032,006 shares of the Company's common stock pursuant to the [agreement]."  It also stated that "[t]he Company did not receive any additional proceeds for the shares, which were issued in a private placement conducted pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended, and Regulation D promulgated thereunder."

43.  On April 11, 2023, NYCB filed a Proxy Statement with the SEC on Form 14a (the "4/11/23 Proxy Statement") inviting investors to its 2023 annual general meeting ("AGM") of shareholders to be conducted on June 1, 2023, stating, in pertinent part, that NYCB had "ended the year with **total assets of $90 billion**, total loans of $69 billion, and total deposits of $59 billion, ranking the Company as one of the largest regional banks in the country."  The 4/11/23 Proxy Statement repeated that "[t]he Signature transaction adds a substantial amount of low-cost deposits and is expected to be **significantly accretive to both earnings per share and tangible book value per share**."

44.  The 4/11/23 Proxy Statement also highlighted NYCB's "robust" risk management program and "risk governance," stating, in pertinent part, as follows:

> Our Board Risk Assessment Committee, which meets the requirements for U.S. Bank Holding Companies under the Dodd-Frank Act's Enhanced Prudential Standards, meets at least on a quarterly basis and oversees a **robust and exacting enterprise risk management program**.
>
> *        *        *
>
> **Risk Governance** – Management of risk is important to the success of our operations and business strategies and our Board devotes significant attention to the oversight of risks inherent in our banking business, including, but not limited to, **credit, interest rate, liquidity, price, operational, strategic, compliance and reputational risks**."

45.  On April 21, 2023, NYCB filed its 2022 Annual Report to Shareholders with the SEC on Form ARS.  The ARS represented that NYCB had $90.1 billion in Total Assets.  In the CEO letter starting on page 2 of ARS, Defendant Cangemi stated, in pertinent part: "I don't expect a large number of banks to fail this time," noting that the "[r]ecent failures appear to be more idiosyncratic

in nature" and that "[t]hey stemmed from each of these banks' specific business models along with substantially high levels of uninsured deposits and *the lack of an appropriate risk management framework.*"

46.    Defendant Cangemi, therefore, falsely conveyed that contrary to those other banks, NYCB had an "appropriate risk management framework" even though NYCB's risk management framework was not appropriate due to the amount of NYCB's total assets, which triggered enhanced risk management practices as a result of the Signature Bank transaction.

47.    The ARS also emphasized that "[n]ot only is the [Signature] transaction expected to immediately and significantly boost our earnings per share and tangible book value per share, but to execute such a transaction during the depths of a crisis, *speaks volumes of the faith and confidence our regulators have in our management team and business model*."

48.    The ARS also highlighted NYCB's deposit growth while promising that "[d]espite our growth over the past several months, *there is one thing we will not outgrow – our conservative underwriting criteria*," that NYCB then had "an enviable track record of historically low levels of losses on our loan portfolio" such that "[a]t the end of last year, our asset quality metrics *remained among the strongest in the industry*."  Elsewhere it stated that "[r]ecently there have been investor concerns about commercial real estate exposure in the banking industry, specifically, exposure to the office sector," yet emphasized that its NYCB's "combined office exposure at year-end 2022 was $3.4 billion or approximately 5% of [its] loan portfolio at that time," adding that "[t]his percentage will decline further with the addition of Signature Bank's loans, none of which were commercial real estate-related."

49.    In an April 28, 2023 press release (the "4/28/23 Press Release"), NYCB announced its first quarter 2023 ("1Q23") financial results for the interim period ended March 31, 2023.  The

byline of the 4/28/23 Press Release emphasized in all caps that the "***SIGNATURE BANK TRANSACTION SIGNIFICANTLY ACCELERATES TRANSITION TO COMMERCIAL BANK TRANSFORMING OUR FUNDING PROFILE AS NON-INTEREST-BEARING DEPOSITS SURGE TO 27% OF TOTAL DEPOSITS***." In addition to reporting approximately $2 billion in net income on $2.653 billion revenues for 1Q23, the release stated, "***Total assets of $123.8 billion*** compared to $90.1 billion at December 31, 2022, ***due to the addition of $35.2 billion in assets***, net of purchase accounting adjustments ("PAA"), ***arising from the Signature transaction*** and organic growth."

50.     The 4/28/23 Press Release quoted Defendant Cangemi as emphasizing that the Company had "successfully navigated the turmoil in the banking industry during the month of March, emerging with the purchase and assumption of certain assets and liabilities of Signature Bridge Bank," and stating that:

> As for the Signature transaction, we believe that this is a game changing deal for us. It builds upon the momentum created by the merger with Flagstar and accelerates our evolution to a diversified, high-performing commercial bank, while jumpstarting our commercial middle market lending business and our relationship banking strategy. It also improves our deposit base and funding mix and further diversifies our loan portfolio. Commercial loans increased to 44% of total loans as the result of an additional $12 billion of loans acquired from Signature, while the amount of non-interest-bearing deposits nearly doubled since year end to $23 billion and now represents nearly one-third of total deposits compared to only 9% before the Flagstar acquisition.

> While we have closed two acquisitions over the past four months, ***we have remained focused on our fundamentals including asset quality***. Our asset quality metrics ***remain strong*** with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. We continue to be laser focused on credit quality across all lending verticals.

51.     Defendant Cangemi was also quoted in the 4/28/23 Press Release as stating that NYCB had "accomplished a lot in a relatively short period of time" and that "[t]he remainder of this year will be devoted to integrating and converting our two acquisitions, reducing expenses, growing

our deposit base further, and building out each of our businesses as we transform to the new Flagstar."

52. Furthermore, the 4/28/23 Press Release confirmed that NYCB's "*asset quality metrics and trends remain strong*" and quoted CFO Pinto as stating, in pertinent part, as follows:

> While we have closed two acquisitions over the past four months, *we have remained focused on our fundamentals including asset quality. Our asset quality metrics remain strong with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. We continue to be laser focused on credit quality across all lending verticals*…

53. As to "*Allowance for Credit Losses*," the 4/28/23 Press Release stated that "[a]t March 31, 2023, the allowance for credit losses was *$550 million* compared to $393 million at December 31, 2022, up $157 million," adding that "[a]pproximately $140 million of the increase was the result of the Signature transaction, including a CECL-related provision of $127 million." The 4/28/23 Press Release also stated that "*net charge-offs were zero during first quarter 2023* compared to $2 million during first quarter 2022 and $1 million during fourth quarter 2022" and that there had been "[a]n initial provision for credit losses totaling $132 million for the loans acquired from Signature."

54. Also on April 28, 2023, NYCB held a conference call with investors and stock analysts to discuss the Company's financial results and condition and provided additional false and misleading statements about the Company's then present business metrics and financial condition.

55. On May 10, 2023, NYCB filed its 1Q23 quarterly financial result with the SEC on Form 10-Q (the "5/10/23 Form 10-Q") which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Defendants Cangemi and Pinto. In addition to reporting the same financial results as contained in the 4/28/23 Press Release, the 10-Q discussed "Regulatory Capital" and stated, in pertinent part, as follows:

The Bank is subject to regulation, examination, and supervision by the OCC and the Federal Reserve (the "Regulators"). The Bank is also governed by numerous federal and state laws and regulations, including the FDIC Improvement Act of 1991, which established five categories of capital adequacy ranging from "well capitalized" to "critically undercapitalized." Such classifications are used by the FDIC to determine various matters, including prompt corrective action and each institution's FDIC deposit insurance premium assessments. Capital amounts and classifications are also subject to the Regulators' qualitative judgments about the components of capital and risk weightings, among other factors.

The quantitative measures established to ensure capital adequacy require that banks maintain minimum amounts and ratios of leverage capital to average assets and of common equity tier 1 capital, tier 1 capital, and total capital to risk-weighted assets (as such measures are defined in the regulations). *At March 31, 2023, our capital measures continued to exceed the minimum federal requirements for a bank holding company and for a bank.*

56.     The 5/10/23 Form 10-Q discussed "Asset Quality," stating, in pertinent part, as follows:

Our asset quality metrics *remained strong* during the first quarter of 2023 with increases in NPLs and NPAs attributable to the Signature Transaction. Total NPLs at March 31, 2023 were $161 million, up $20 million or 14 percent compared to December 31, 2022. Total NPAs were $174 million at March 31, 2023, up $21 million or 14 percent compared to December 31, 2022. Repossessed assets of $13 million were relatively unchanged compared to the $12 million recorded in the prior quarter.

At March 31, 2023, NPAs to total assets equaled 14 basis points compared to 17 basis points at December 31, 2022 while NPLs to total loans equaled 20 basis points compared to 20 basis points at December 31, 2022.

57.     The 5/10/23 Form 10-Q reassured investors that the allowance for loan losses remained adequate, stating, in pertinent part, as follows:

*Historically, our level of net charge-offs has been relatively low in downward credit cycles, even when the volume of non-performing loans has increased*. For the three months ended March 31, 2023, our net charge-offs were zero as compared to net charge-offs of $2 million over the same period in 2022.

*The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022*. The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume. The allowance for credit losses on

- 17 -

loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.

**Based upon all relevant and available information at March 31, 2023, management believes that the allowance for losses on loans was appropriate at that date.**

58.     On May 18, 2023, NYCB filed its final Prospectus with the SEC on Form 424B7 to register the approximately 39 million shares of Company stock sold by the FDIC in connection with the Signature Bank transaction.  In exchange for those shares, the FDIC immediately received $392,378,998 and ceased any ownership interest in NYCB.  The Prospectus acknowledged that "**[a]s of March 31, 2023, the Company had $123.7 billion of total assets**, $82.5 billion of total loans and leases, total deposits of $84.8 billion, and total stockholders' equity of $10.8 billion," well above the $100 million in assets required for enhanced bank scrutiny and stricter standards.

59.     Elsewhere, as a mere potential risk, rather than a then present fact, the Prospectus listed "the ability to successfully integrate branches and operations **and to implement appropriate internal controls and regulatory functions relating to such activities**."  It also explicitly incorporated by reference NYCB's "Annual Report on Form 10-K for the year ended December 31, 2022 and [its] Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2023, for a discussion of certain risks related to NYCB's business and the Signature transaction."

60.     In a July 27, 2023 press release (the "7/27/23 Press Release"), NYCB announced its second quarter 2023 ("2Q23") financial results for the interim period ended June 30, 2023, emphasizing in all caps that: "**CAPITAL RATIOS TREND HIGHER**."  In addition to reporting $413 million in net income on $1.202 billion in revenues, the 7/27/23 Press Release highlighted that 2Q23 "net income and diluted EPS were impacted by a **bargain purchase gain** of $141 million arising from the Signature transaction."  The 7/27/23 Press Release also represented that "[a]t June 30, 2023 **total assets were $118.8 billion** compared to $123.7 billion at March 31, 2023 and $90.1

billion at December 31, 2022." The 7/27/23 Press Release also quoted Defendant Cangemi as stating, in pertinent part, as follows:

> We also reported very positive balance sheet trends. Our funding composition continues to improve as core deposits have increased over the past quarter, while our reliance on wholesale borrowings has declined. Total deposits increased $3.7 billion or 17% annualized on a linked-quarter basis to $88.5 billion, as the increase in non-interest-bearing deposits more than offset the decline in other categories including CDs and deposits related to loan portfolios we did not acquire from Signature. Non-interest-bearing deposits now represent 29% of total deposits.

> At the same time, wholesale borrowings declined 24% or $4.9 billion during the current quarter, as we used some of the cash from the Signature transaction to reduce the level of FHLB-NY borrowings. On the lending front, total loans were up modestly despite the higher interest rate environment and is reflective of our diversification efforts, as growth in the commercial portfolio offset declines in other lending verticals. Commercial loans represented 44% of total loans at quarter end.

> ***Our asset quality remains strong***. ***Our overall metrics are still among the best in the industry***, with NPAs at a mere 21 basis points of total assets, even though we had an uptick in non-performing loans. Additionally, we had a net recovery of $1 million during the quarter."

61. Elsewhere the release reassured investors that NYCB's "***asset quality trends remain among the best in the industry***, despite the slightly higher NPLs," and that "[a]t June 30, 2023, the allowance for credit losses was ***$594 million*** compared to $550 million at March 31, 2023, up $44 million."

62. The 7/27/23 Press Release discussed "***Allowance for Credit Losses***," and stated that "[a]t June 30, 2023, the allowance for credit losses was $594 million compared to $550 million at March 31, 2023, up $44 million" and that the "allowance for credit losses to total loans held for investment increased to 71 basis points at June 30, 2023 compared to 67 basis points at March 31, 2023."

63. Also on July 27, 2023, NYCB held a conference call with investors and stock analysts to discuss the Company's financial results and condition and provided additional false and misleading statements about the Company's then present business metrics and financial condition.

64.     As a result of Defendants' positive statements, on July 28, 2023, the market price of NYCB common stock rose to an intraday Class Period high of $14.22 per share.

65.     On August 9, 2023, NYCB filed its 2Q23 quarterly financial report with the SEC on Form 10-Q (the "8/9/23 Form 10-Q") which was signed and certified pursuant to the SOX by Defendants Cangemi and Pinto. The 8/9/23 Form 10-Q discussed "***Regulatory Capital***," and stated, in pertinent part, as follows:

> The Bank is subject to regulation, examination, and supervision by the OCC and the Federal Reserve (the "Regulators"). The Bank is also governed by numerous federal and state laws and regulations, including the FDIC Improvement Act of 1991, which established five categories of capital adequacy ranging from "well capitalized" to "critically undercapitalized." Such classifications are used by the FDIC to determine various matters, including prompt corrective action and each institution's FDIC deposit insurance premium assessments. Capital amounts and classifications are also subject to the Regulators' qualitative judgments about the components of capital and risk weightings, among other factors.
>
> The quantitative measures established to ensure capital adequacy require that banks maintain minimum amounts and ratios of leverage capital to average assets and of common equity tier 1 capital, tier 1 capital, and total capital to risk-weighted assets (as such measures are defined in the regulations). At June 30, 2023, our capital measures continued to exceed the minimum federal requirements for a bank holding company and for a bank.

66.     As to "Asset Quality," the 8/9/23 Form 10-Q stated, in pertinent part, as follows:

> ***Our asset quality metrics remained strong during the second quarter of 2023*** despite increases in NPLs and NPAs attributable to certain loans acquired in the Signature Transaction and Flagstar acquisition. At June 30, 2023, NPAs to total assets equaled 0.21 percent compared to 0.14 percent at March 31, 2023 while NPLs to total loans equaled 0.28 percent compared to 0.20 percent at December 31, 2022. Repossessed assets of $13 million were relatively unchanged compared to the $13 million recorded in the prior quarter.

67.     The 8/9/23 Form 10-Q also stated, in pertinent part, as follows:

> At June 30, 2023, ***total assets were $118.8 billion***, up $28.7 billion compared to December 31, 2022. Total deposits were $88.5 billion at June 30, 2023, up $29.8 billion from December 31, 2022. ***These year-to-date increases were primarily due to our March 20, 2023, assumption of a substantial amount of the deposits and certain identified liabilities and the acquisition of certain assets and lines of***

*business of Signature Bridge Bank, from the FDIC, as receiver for Signature Bridge Bank (the "Signature Transaction")*.

\*   \*   \*

*The allowance for credit losses on loans and leases increased $201 million, equaling $594 million at June 30, 2023 from $393 million at December 31, 2022. The increase was primarily related to the initial allowance for credit losses of $132 million for the acquired loans in the Signature Transaction*, an increase of $13 million in specific reserves primarily related to two loans that had moved to nonaccrual and an increase of $56 million primarily related to our worsening forecast of macroeconomic conditions and origination volume since year-end.  The allowance for credit losses on loans and leases represented 255 percent of nonperforming loans at June 30, 2023, as compared to 279 percent at the prior year-end.

*Based upon all relevant and available information at June 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as that date*.

68.     In a press release on September 6, 2023, NYCB announced that it had named "Julie Signorille-Browne as Senior Executive Vice President and Chief Operating Officer," stating that "[i]n addition to her current duties, which mainly include managing all retail banking operations, corporate real estate management and shared services, commercial loan servicing operations, and the customer contact center, Ms. Signorille-Browne will also be responsible for information technology and human resources and will have oversight of both the Flagstar and Signature Bank conversions."

69.     In an October 26, 2023 press release (the "10/26/23 Press Release"), NYCB announced its third quarter 2023 ("3Q23") financial results for the interim period ended September 30, 2023, emphasizing in all caps in the byline that "***FUNDING COMPOSITION CONTINUES TO IMPROVE AS WHOLESALE BORROWINGS AND BROKERED DEPOSITS CONTINUE TO DECLINE***."  In addition to reporting $207 million in net income on $1.042 billion in revenues, the release reported that "[a]t September 30, 2023 ***total assets were $111.2 billion*** compared to $118.8 billion at June 30, 2023 and $90.1 billion at December 31, 2022" and that the "linked-quarter decrease was primarily driven by lower balances of cash and cash equivalents."  The release further

stated that "*[f]or the three months ended September 30, 2023, the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023*."

70.    The 10/26/23 Press Release also stated that NYCB's "nine-month net income and diluted EPS include a ***bargain purchase gain*** of $2.1 billion arising from the Signature transaction," and that "[t]he allowance for credit losses totaled $619 million at September 30, 2023 or 158% of non-performing loans and 0.74% of total loans."  The 10/26/23 Press Release also quoted Defendant Cangemi as stating, in pertinent part, as follows:

> On the asset quality front, while we experienced a significant decline in early-stage delinquencies compared to the previous quarter, non-performing loans increased on a linked-quarter basis, owing primarily to two commercial real estate loans in the office sector. ***Despite this, our asset quality metrics continue to be among the best in the industry*** with non-performing loans at 47 basis points of total loans and net charge-offs of only three basis points. This reflects our conservative underwriting practices.

71.    Also on 10/26/23, NYCB held a conference call with investors and stock analysts to discuss the Company's financial results and condition and provided additional false and misleading statements about the Company's then present business metrics and financial condition.

72.    On October 26, 2023, NYCB also filed its 3Q23 Investor Presentation slides with the SEC (the "10/26/23 Presentation").  The 10/26/23 Presentation emphasized NYCB's "Solid balance sheet" and that "Total assets of ***$111.2 billion*** declined $7.6 billion compared to June 30, 2023, primarily due to lower cash balances resulting from a decrease in FDIC custodial deposits," without explaining that it was subject to enhanced scrutiny and reporting requirements.  A slide in the presentation also emphasized NYCB's then "Strong capital and disciplined credit," stating NYCB "remain[ed] well capitalized ***and well above the minimum thresholds for all applicable capital ratios***" and that "NPLs/Total Loans was 0.47%" and "Net charge-offs of $24 million."

73.    As to "***Credit Quality***," the 10/26/23 Presentation emphasized that NYCB's "current and historical net charge-offs demonstrate non-performing loans result in low levels of actual

losses." As to "**Regulatory Capital**," the 10/26/23 Presentation stated, "We remain well capitalized and well above the minimum thresholds for all applicable ratios." The 10/26/23 Presentation also discussed "Office portfolio characteristics" and emphasized that the Company "[c]ontinue[d] to perform enhanced monitoring on the portfolio" and described "[t]wo nonperforming loans totaling $124 million and net chargeoffs of $14 million."

74.    On November 9, 2023, NYCB filed its quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to SOX by Defendants Cangemi and Pinto (the "11/9/23 Form 10-Q"). In addition to providing the same financial results as reported in the 10/26/23 Press Release, the 11/9/23 Form 10-Q discussed "Regulatory Capital" and stated, in pertinent part, as follows:

> The Bank is subject to regulation, examination, and supervision by the OCC and the Federal Reserve (the "Regulators"). The Bank is also governed by numerous federal and state laws and regulations, including the FDIC Improvement Act of 1991, which established five categories of capital adequacy ranging from "well capitalized" to "critically undercapitalized." Such classifications are used by the FDIC to determine various matters, including prompt corrective action and each institution's FDIC deposit insurance premium assessments. Capital amounts and classifications are also subject to the Regulators' qualitative judgments about the components of capital and risk weightings, among other factors.

> The quantitative measures established to ensure capital adequacy require that banks maintain minimum amounts and ratios of leverage capital to average assets and of common equity tier 1 capital, tier 1 capital, and total capital to risk-weighted assets (as such measures are defined in the regulations). *At September 30, 2023, our capital measures continued to exceed the minimum federal requirements for a bank holding company and for a bank*.

75.    As to "Asset Quality," the 11/9/23 Form 10-Q stated, in pertinent part, as follows:

> At September 30, 2023, NPA to total assets equaled 0.40 percent compared to 0.21 percent at June 30, 2023 while NPL to total loans equaled 0.52 percent compared to 0.28 percent at June 30, 2023. The increase in NPLs were primarily related to two commercial real estate loans in the office sector that added $139 million in the third quarter of 2023 and multi-family increased $91 million of which the largest individual loan was $42 million. Repossessed assets of $12 million were slightly lower compared to $13 million in the prior quarter.

76.     As to the Company's loan loss provisions, the 11/9/23 Form 10-Q stated, in pertinent part, as follows:

**Provision for Credit Losses**

*Comparison to Prior Quarter*

The three months ended September 30, 2023 the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023.

***During the third quarter 2023, we incorporated the commercial loans and unfunded commitments acquired in the Signature Transaction in the Company's allowance for credit loss models which resulted in a net provision benefit of $13 million***.  The $75 million provision on the remainder of the portfolio was driven by increases to our estimated loan loss and unfunded commitment reserves as a result of changes in the macroeconomic environment, specifically the inflationary pressures leading to sharp increases in interest rates and a slow-down of prepayment activity leading to longer weighted average lives on the balance sheet.  In addition, the increase reflects unfavorable market conditions in the CRE portfolio (primarily office). During the quarter we had net charge-offs totaling $24 million.

The second quarter 2023 provision of $49 million included increases of $13 million related to specific reserves for new non-accrual loans and the remainder was driven by changes in the macroeconomic forecast.

*            *            *

***We continue to monitor our loans held for investment portfolio and the related allowance for credit losses,*** particularly given the economic pressures facing the commercial real estate and multi-family markets.  While our multi-family lending niche has not been immune to downturns in the credit cycle, ***the limited number of losses we have recorded, even in adverse credit cycles, suggests that the multi-family loans we produce involve less credit risk than certain other types of loans. In general, buildings that are subject to rent regulation have historically tended to be stable, with occupancy levels remaining more or less constant over time.*** Because the rents are typically below market and the buildings securing our loans are generally maintained in good condition, they have been more likely to retain their tenants in adverse economic times.  In addition, we generally exclude any short-term property tax exemptions and abatement benefits the property owners receive when we underwrite our multi-family loans.

77.     The statements in ¶¶36-40, 43-57, 59-63, 65-67, 69-76 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining

to the Company's business, operations, financial condition, and internal controls and procedures, which were known to defendants or recklessly disregarded by them:

(a)     that the Signature Bank acquisition would not be immediately accretive to the Company because it caused NYCB to be required to comply with materially enhanced prudential standards, including, among other things, risk-based and leverage capital requirements, and liquidity standards, and required that NYCB build capital, reinforce its balance sheet and strengthen its risk management processes;

(b)     that NYCB failed to comply with the materially enhanced prudential standards;

(c)     that NYCB overstated the quality of its commercial office loan assets;

(d)     that NYCB was experiencing higher net charge-offs and deterioration in its commercial office portfolio than represented;

(e)     that NYCB was reasonably likely to incur higher loan losses because it was experiencing higher net charge-offs and deterioration in its commercial office portfolio;

(f)     that NYCB was reasonably likely to be forced to increase its allowance for credit losses due to its status as Category IV bank;

(g)     that NYCB's loan loss provisions were understated so it overstated quarterly earnings and/or understated quarterly losses;

(h)     that NYCB failed to have adequate internal risk or disclosure controls and procedures; and

(i)     that, as a result of the foregoing, defendants' statements about NYCB's business, operations and financial condition were materially false and misleading and/or lacked a reasonable basis at all relevant times.

78.     On January 31, 2024, before the opening of trading, NYCB issued a press release and announced its 4Q23 and FY23 financial results (the "1/31/24 Press Release").  In the 1/31/24 Press Release, NYCB disclosed that it had recorded a $552 million provision for loan losses, up significantly from the $62 million reported just one quarter earlier, and that as a result, the Company had incurred a 4Q23 **loss** of $252 million, or $0.36 per share, down significantly from a **profit** of $0.27 per share Wall Street consensus estimate that the Company had led investors to expect based on its bullish Class Period statements. The 1/31/24 Press Release explained that the larger provision for loan losses was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio.  As to credit losses, the release stated that "[a]t December 31, 2023, the allowance for credit losses was $992 million compared to $619 million at September 30, 2023, up $373 million ***reflecting our actions to build reserves during the quarter to address weakness in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets, which better aligns the Company with its relevant bank peers, including Category IV banks***."  The release further stated, in pertinent part, as follows:

> For the three months ended December 31, 2023, the provision for credit losses totaled $552 million compared to a $62 million provision for the three months ended September 30, 2023.  ***The increase is primarily attributable to higher net charge-offs***, as well as, to address weakness in the office sector, potential repricing risk in the multi-family portfolio, and an increase in classified assets.
>
> \*     \*     \*
>
> ***Fourth quarter net charge-offs were primarily related to two loans***.  First, we had one co-op loan with a unique feature that pre-funded capital expenditures.  Although the borrower was not in default, the loan was transferred to held for sale during the fourth quarter.  We expect the loan to be sold during the first quarter of 2024. We also performed a review of other co-op loans and did not find any other loans with similar characteristics.
>
> Second, we had an additional charge-off on an office loan that went non-accrual during the third quarter, based on an updated valuation. Given the impact of recent credit deterioration within the office portfolio, we determined it prudent to increase the ACL coverage ratio.

*Together, these two loans accounted for the bulk of the $185 million of net charge-offs we took during the fourth quarter.*

79.     The Company also disclosed that NYCB was just then adjusting to the demands of being a large bank after its purchase of assets and liabilities from Signature Bank, stating that with the deal, the Company's assets under management had surpassed $100 billion, thereby "subjecting [it] to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards" and more, and that as a result, it had "[taken] decisive actions to build capital, reinforce our balance sheet, strengthen [its] risk management processes, and better align [itself] with the relevant bank peers."

80.     NYCB also disclosed it would cut the Company's historically stable quarterly dividend from $0.17 per share to just $0.05 per share.

81.     In response to the Company's announcements on January 31, 2024, the price of NYCB common stock fell $3.91 per share, *or 38%*, to close at $6.47 per share on January 31, 2024, on unusually high trading volume of more than 128.8 million shares traded.

82.     After the close of trading on January 31, 2024, Moody's Investors Service announced that it had placed all of NYCB's ratings, including the bank's long-term issuer rating of Baa3 — the lowest investment-grade level — on review for possible downgrade to junk status, citing the Company's surprise 4Q23 loss and slashing of its dividend.

83.     In response to the announcements after the close of trading on January 31, 2024, the price of NYCB common stock closed down another $0.82 per share on February 1, 2024, on unusually heavy trading volume of nearly 126 million shares traded.

84.     Then, on February 5, 2024, after the close of trading, *Bloomberg* reported, citing "people with direct knowledge of the matter," that it had been "mounting pressure from a top US watchdog" that "led to" NYCB's "surprise decision to slash its dividend and stockpile cash in case

commercial real estate loans [went] bad."  According to the Bloomberg article, "[t]he drastic financial moves . . . followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency [the "OCC"], the people said, asking not to be identified describing the confidential discussions."

85.     Additionally, Bloomberg reported that "[t]wo senior executives left their posts in the months before the bank unveiled its measures."  According to Bloomberg, "[a]s of late last year, the company's website no longer showed chief risk officer Nicholas Munson and chief audit executive Meagan Belfinger on its leadership page" and that the "changes weren't publicly reported by the firm at the time."

86.     In response to the announcements on February 5, 2024, the price of NYCB common stock closed down another $1.20 per share, or 22%, to close at $4.20 per share on February 6, 2024, its lowest level since 1997, on unusually high trading volume of more than 147 million shares traded.

87.     Finally, on February 6, 2024, after the close of trading, Moody's Investor Service followed slashed the Company's corporate debt ratings to junk.  NYCB also announced that it had further shaken up its executive leadership, naming Alessandro DiNello, the former head of Flagstar, as executive chairman.  As reported by the Wall Street Journal, "[h]e said he was coming in to right the ship."

## ADDITIONAL SCIENTER ALLEGATIONS

88.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the

federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding NYCB, and their control over and/or receipt and/or modification of NYBC's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

89.     Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

90.     The Individual Defendants, because of their positions with NYCB, controlled the contents of NYCB's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of NYCB's corporate statements and is, therefore, responsible and liable for the representations contained therein.

91.     Throughout the Class Period, the Individual Defendants held themselves out as the persons most knowledgeable about the Company's revenue, earnings, and financial condition, and made repeated representations to investors in SEC filings, conference calls, and Company-issued press releases regarding these topics based on this purported knowledge.  Furthermore, the topics

involved the Company's most important issues and were closely watched by the Individual Defendants, and the Individual Defendants signed certifications personally attesting that the information misrepresented to the market, as detailed herein, was true, accurate, and free from fraud.

92. The scienter of defendants is underscored by the certifications of the Individual Defendants mandated under SOX, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about NYCB was made known to them and that the Company's internal controls were operating effectively.

93. The scienter of defendants is supported by the fact that the Company's chief risk officer and chief audit executive left employment at the Company close in time to the end of the Class Period and the revelations of the fraud as alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

94. During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of NYCB securities and operated as a fraud or deceit on Class Period purchasers of NYCB securities by misrepresenting the value of the Company's business and financial condition. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of NYCB common stock fell precipitously as the prior artificial inflation came out of the stock's price. As a result of their purchases of NYCB common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

95. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of NYCB who knew that those statements were false when made.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

96.     At all relevant times, the market for NYCB common stock was an efficient market for the following reasons, among others:

(a)     NYCB common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, NYCB filed periodic public reports with the SEC and the NYSE;

(c)     NYCB regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     NYCB was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e)     As a result of the foregoing, the market for NYCB common stock promptly digested current information regarding NYCB from all publicly available sources and reflected such information in the price of the common stock.   Under these circumstances, all purchasers or acquirers of NYCB common stock during the Class Period suffered similar injury through their purchase(s) of NYCB common stock at artificially inflated prices and a presumption of reliance applies.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
***AFFILIATED UTE* DOCTRINE**

97.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because defendants' material omissions during the Class Period caused harm to plaintiff and the Class. Because the complaint alleges defendants' failure to disclose material adverse information regarding NYCB – information defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

98.     Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**CLASS ACTION ALLEGATIONS**

99.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of NYCB securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times,

- 32 -

members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

100.    The members of the Class are so numerous that joinder of all members is impracticable.  NYCB common stock was actively traded in the United States on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by NYCB or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

101.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

102.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

103.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of NYCB; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

104.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

105.     Plaintiff incorporates ¶¶1-104 by reference.

106.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of NYCB common stock during the Class Period.

108.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NYCB common stock.  Plaintiff and the Class would not have purchased NYCB common stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

109.    Plaintiff incorporates ¶¶1-108 by reference.

110.    The Individual Defendants acted as controlling persons of NYCB within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of NYCB securities, the Individual Defendants had the power and authority to cause NYCB to engage in the wrongful conduct complained of herein.  NYCB controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 13, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
MARY K. BLASY


*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
mblasy@rgrdlaw.com

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: 212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Dale Miskey ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __06__  day of February, 2024.



DocuSigned by:

Dale Miskey

7B62R574C848BC

_____
Dale Miskey

New York Community Bancorp, Inc.

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 12/18/2023 | 360 | $10.71 |

Prices listed are rounded up to two decimal places.